UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL ANTHONY WADE, JR.,

                        Petitioner,

        v.

JERI BOE,

                        Respondent.

Case No. C20-0097-RAJ-MAT

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Michael Wade is a Washington prisoner who is currently confined at the Clallam Bay Corrections Center in Clallam Bay, Washington.  He seeks relief under 28 U.S.C. § 2254 from a 2013 King County Superior Court judgment and sentence.  Respondent has filed an answer responding to petitioner's federal habeas claims and has submitted relevant portions of the state court record.  Petitioner has filed a response to respondent's answer.  This Court, having carefully reviewed petitioner's petition for writ of habeas corpus, all briefing of the parties, and the state court record, concludes that the petition should be denied and this action should be dismissed with prejudice.

/ / /

REPORT AND RECOMMENDATION
PAGE - 1

1

## FACTUAL BACKGROUND

2    The Washington Court of Appeals, on direct appeal, summarized the facts underlying

3  petitioner's conviction as follows:

4        On a Tuesday afternoon, October 9, 2012, three homes in Seattle area
     suburban neighborhoods were burglarized within a three-hour time-span.  The first
5     burglary took place at the Kirkland home of Paul Wu.  Wu's neighbor, Hana Trnka,
     was unloading groceries from her car at around noon, when she noticed a grayish
6     sedan parked near her house in front of an empty lot.  Trnka approached the car and
     asked the driver if he was lost or needed assistance.  The sole occupant sitting in
7     the driver's seat was a bald-headed thin man who appeared to be of Middle Eastern
     descent.  The man was talking on a cell phone.  He told Trnka he did not need help,
8     but explained that he parked to avoid talking while driving.

9        Wu's wife returned home after lunch and discovered the break-in[.]  The
     burglars had entered the home by shattering a sliding glass door at the back deck.
10    The stolen items included laptop computers, a tablet, jewelry, a Pentax camera,
     handbags, and coins.

11
         The second burglary occurred at a Kenmore home belonging to Binh Vu.
12    The Vus returned home at approximately 2:00 p.m. and discovered their home had
     been ransacked and burglarized.  The burglars again entered the home by breaking
13    a glass door at the back of the house.  The items taken from the home included
     numerous bottles of liquor, gold jewelry, and a tablet Vu recently purchased.

14
         The third burglary occurred at the Kirkland home of Carl Reek.  That
15    afternoon, Reek's neighbor, Vanessa Simpson, walked her dog past the Reeks'
     house and noticed a golden brown sedan parked in front.  A thin man with brown
16    skin was sitting in the driver's seat and leaned back in his seat as Simpson passed.
     When Simpson passed the Reeks' home a second time about 10 minutes later, the
17    car was gone and Reek's wife was standing at the front door.

18        It was shortly after 2:00 p.m. when Reek's wife returned home, thought she
     heard people inside the house, and then saw that the front door had been kicked in.
19    Several upstairs rooms were visibly disturbed and plastic shopping bags normally
     stored in the bathroom were strewn around.  Reek reported numerous missing items
20    including six firearms, approximately $1,400 in cash, jewelry, laptops, a tablet, a
     Kodak camera, and a package of .38 caliber ammunition.

21
         About a month before the burglaries, Reek answered a knock at the door
22    and observed a thin African-American man on the doorstep.  It was not clear what
     the man wanted.  He backed off the porch when Reek opened the door and said
23    something unintelligible about an "opportunity."  Then, exactly two weeks before

REPORT AND RECOMMENDATION
PAGE - 2

the burglaries, Reek answered another knock at the door and a different, larger African-American man was at the door. Reek communicated that he was occupied on the phone and the man left. Also, in the weeks before the burglary, Reek noticed a brownish gold Toyota Camry parked in different places in the neighborhood.

A few days before the burglaries, a caller reported seeing a gold Camry parked in several different locations in an Eastside residential neighborhood. The caller provided a license plate number and said that at one point, the occupants got out of the car and walked around a house. A police officer went to investigate and saw the car as it passed him travelling in the opposite direction. There were at least three African-American males in the car. The officer was unable to catch up with the car.

On the date of the burglaries, Bellevue Police Detective Jeffrey Christiansen received information about the gold Camry from a few days before, and without knowing the burglaries had just occurred, decided to investigate. Christiansen learned that the Camry was registered to Carol Anderson and associated with her grandson, Michael Wade. Christiansen and a surveillance team arrived at Anderson's home in South Seattle at approximately 3:30 p.m.

About 30 minutes later, the gold Camry arrived. There were four people in the car. Wade was driving the Camry and a person later identified as Filmon Berhe was in the front passenger's seat. After Wade parked, he went around to the back of the car and opened the trunk. One of the back seat passengers, later identified as Wade's brother Cody Wade, got out of the car and stood next to Wade. Wade appeared to be manipulating items in the trunk while Cody visually scanned the area.[footnote omitted]  About a minute later, as a parking enforcement vehicle drove by, Cody tugged at the back of Wade's shirt and Wade closed the lid of the trunk. . . . Wade then reopened the trunk, Cody took a white plastic shopping bag and walked across the street with it and out of the detectives' view. The bag appeared to be weighed down by heavy objects.

Wade, Berhe, and the fourth person, later identified as Christopher Patterson, went toward Anderson's house. A few minutes later, all four returned to the car, Wade drove away from the house, and the officers followed. Eventually, the car stopped at a strip mall and Cody and Patterson got out of the car and carried a small bag into a jewelry store. Wade parked across the street.

At that point, Detective Christiansen was able to definitely confirm that Wade was the driver and decided to arrest him on an outstanding warrant. During the process of that arrest, police officers learned of another warrant for Berhe's arrest and arrested him at the same time. From outside the Camry, Detective Christiansen could see several cloth gloves and a partially obscured tablet inside the car.

REPORT AND RECOMMENDATION
PAGE - 3

While some officers arrested Wade and Berhe, other officers briefly detained Cody and Patterson. After the officers released Cody and Wade [sic], the jewelry store owner confirmed that they had sold some jewelry and later, one of the homeowners confirmed that some of the jewelry belonged to him.

The police searched the Camry and found a substantial amount of property stolen from all three homes including tablets, computers belonging to Wu and Reek, Wu's Camera, and bottles of alcohol. The Camry also contained an extra-large jacket with glass shards in the pockets and several cell phones. However, the firearms taken from the Reek residence were not in the Camry. Seattle police officers eventually found one of the firearms missing from the Reek residence in a stolen car.

Two days after arresting Wade and Berhe, police officers arrested Cody and Patterson. Patterson admitted that he committed the burglaries with Wade, Berhe, and Cody. Patterson specifically confirmed that the stolen property included firearms and said that Wade was the person who primarily handled the guns.

Within an hour of his arrest, Wade began making desperate telephone calls from the jail, telling Cody that if he ever wanted to see him and Berhe "alive" again, he must "immediately" get rid of the "dunt-dunt-da-dunt-dunt-dalas" that were located in "Barney the dinosaur[.]" Wade stressed the urgency of this, repeatedly stating that the "dunt-dunt-da-dahs" must be "[o]ut of Barney" and that "Barney" had to be absolutely "clean and sober." Wade talked at length about the numerous potential firearms charges and sought assurance that the State would not be able to pursue those charges without finding the stolen firearms.

Police searched Anderson's home and a purple GMC Yukon vehicle associated with Cody parked across the street from Anderson's home, but found no evidence inside the home or the vehicle related to the burglaries. However, when the Yukon was towed, police found a white plastic shopping bag underneath the vehicle containing ammunition.

The State charged Wade, Berhe, Patterson, and Cody with three counts of residential burglary and two counts of theft of a firearm. The State later amended the information and charged each defendant with a total of 12 counts: three counts of residential burglary, six counts of theft of a firearm, one count of trafficking in stolen property, one count of theft in the second degree, and one count of unlawful possession of a firearm.[footnote omitted] Berhe, Patterson, and Cody each entered guilty pleas and were sentenced prior to trial.[1] Wade waived his right to a jury and

---

[1] [Court of Appeals' footnote 3] Patterson pleaded guilty to three counts of residential burglary, one count of unlawful possession of a firearm, and one count of theft of a firearm. According to the State's sentencing memorandum, the State made the same plea offer to Wade before trial and offered to recommend a low-end sentence of 164 months. After the State rested, the State made a second offer to dismiss four of the six theft of a firearm counts, which would have reduced the bottom of the range from 549 months to 241 months. The record does not include

REPORT AND RECOMMENDATION
PAGE - 4

proceeded to a bench trial.

The State presented evidence of cell phone activity indicating that Wade, Berhe, and Cody were in cell phone contact with each other and were "in proximity to each house at the time of the burglaries." For instance, there was a 25 minute call between Berhe and Cody near the Wu home that started at approximately 11:45 a.m., encompassing the time that Trnka reported speaking to someone matching Berhe's description, who was talking on a cell phone.

Patterson reluctantly testified under a grant of immunity. Contrary to his statement at the time of his arrest, Patterson testified that he burglarized two houses by himself on October 9. He denied stealing any firearms. Patterson said that Cody and Berhe picked him up after the burglaries and he sold some stolen laptops while driving around with them. Patterson testified that Wade later joined the group, they switched cars to the Camry, and he put another stolen item, an iPad, in the trunk of the Camry and planned to sell it. Patterson claimed that the jewelry he sold belonged to his girlfriend.

Patterson testified that he never implicated the others or admitted to taking firearms. Patterson acknowledged that he signed a statement containing false information, but explained that the police forced him to sign and said they would help him. The State read some portions of Patterson's statement and asked whether or not those specific statements were true, including Patterson's statement the he "was with Mike and Cody Wade and Phil" on October 9, 2012 and his statement that Wade brought the guns into the house and that the six guns were together in one plastic shopping bag.

Detective Christiansen described Patterson's arrest and recounted Patterson's postarrest statements that he committed the burglaries with Wade, Cody and Berhe and his statement that Wade was the person who handled the firearms after the burglaries.

Investigators did not find any fingerprint print [sic] evidence at the burglary scenes, suggesting that the suspects wore gloves. Police showed the Wus' neighbor, Trnka, a photo montage and she identified Berhe immediately as the man parked on the Wus' street at the time of the burglary.

The court entered findings of fact and conclusions of law and found Wade guilty of all twelve charges. At sentencing, the State conceded that theft in the second degree involving the property stolen from the Vu residence, amounted to the same criminal conduct as residential burglary of the Vu residence. The court did not include the theft conviction in the offender score calculation and did not impose a sentence on that count. Due to the operation of RCW 9.94A.589(1)(c),

---

information about the sentences of the other participants, but Wade indicates in his briefing that the sentences of Berhe, Cody, and Patterson were 124 months, 89 months, and 84 months respectively.

REPORT AND RECOMMENDATION
PAGE - 5

which requires consecutive terms for the theft of firearm and unlawful possession of a firearm convictions, Wade's standard range was between 549 and 728 months. The court imposed 549 months.

(Dkt. 11, Ex. 20 at 1-8.)

<u>PROCEDURAL BACKGROUND</u>

Petitioner appealed his convictions and sentence to the Washington Court of Appeals. Petitioner's appellate counsel identified the following five assignments of error in petitioner's opening brief on appeal:  (1) the trial court erred in admitting co-defendant Christopher Patterson's prior inconsistent statement as substantive evidence; (2) even if Patterson's post-arrest statement was properly admitted, the trial court erred in finding it could support the conclusion that petitioner committed the crime of unlawful possession of a firearm; (3) the admission of Patterson's prior inconsistent statement denied petitioner a fundamentally fair trial; (4) the trial court erred in concluding that there was sufficient evidence to convict petitioner of anything but the trafficking in stolen property charge; and (5) the trial court erred in failing to find that the six counts of theft of a firearm were the same criminal conduct for sentencing purposes.  (*See id*., Ex. 17 at 1-2.)  On June 29, 2015, the Court of Appeals issued an unpublished opinion affirming petitioner's convictions and sentence.  (*Id*., Ex. 20.)

Petitioner thereafter sought discretionary review in the Washington Supreme Court.  (*Id*., Ex. 13.)  Petitioner's appellate counsel identified the following three issues in petitioner's petition for review:

> 1.    Did the trial court err in admitting co-defendant Patterson's prior inconsistent statement as substantive evidence because it was not a statement of "identification of a person made after perceiving the person" as required by ER 801(d)(l)(iii)?
>
> 2.    Even if the trial court properly admitted co-defendant Patterson's statement for identification purposes, did the trial court exceed the bounds of the rule when it

REPORT AND RECOMMENDATION
PAGE - 6

permitted the investigating officer to repeat co-defendant Patterson's other statements detailing Wade's involvement beyond the "identification?"

3.      Even with co-defendant Patterson's statement, was there sufficient evidence to convict Wade of anything other than trafficking in or possessing stolen property?

(*Id*., Ex. 21 at 5.) The Supreme Court denied review without comment on December 2, 2015, and the Court of Appeals issued a mandate terminating direct review on January 8, 2016. (*Id*., Exs. 22, 23.)

On December 29, 2016, petitioner filed a personal restraint petition in the Washington Court of Appeals wherein he challenged, on ineffective assistance of counsel grounds, the imposition of consecutive sentences for his convictions on the multiple firearm offenses. (*See id*., Ex. 24.) The State conceded in its response to petitioner's personal restraint petition that petitioner was entitled to relief under the Washington Supreme Court's then recent decision in *State v. McFarland*, 189 Wn.2d 47 (2017), because the trial court in petitioner's case mistakenly believed it did not have the discretion to impose an exceptional sentence below the standard range. (*Id*., Ex. 29.) The Court of Appeals accepted the State's concession, vacated petitioner's sentence, and remanded the case for resentencing in accordance with *McFarland*. (*Id*., Ex. 31.)

On remand, the Superior Court imposed an exceptional sentence below the standard range of 241 months imprisonment. (*See id*., Exs. 13, 16.) The Superior Court entered an amended judgment and sentence on July 20, 2018. (*Id*., Ex. 16.) Petitioner appealed the new sentence to the Washington Court of Appeals and, on November 4, 2019, the Court of Appeals issued an unpublished opinion affirming the sentence. (*See id*., Exs. 33, 35.) Petitioner thereafter filed a petition for review in the Washington Supreme Court. (*Id*., Ex. 36.) The Supreme Court denied review without comment on March 4, 2020, and the Court of Appeals issued a mandate terminating review on March 13, 2020. (*Id*., Exs. 37, 38.) Petitioner now seeks federal habeas review of his

REPORT AND RECOMMENDATION
PAGE - 7

1    convictions.

2                              GROUNDS FOR RELIEF

3              Petitioner identifies two grounds for relief in his federal habeas petition: (1) petitioner was

4    denied his rights to due process and a fair trial by the admission of Christopher Patterson's hearsay

5    statement as substantive evidence; and (2) the State presented insufficient evidence at trial to

6    support petitioner's conviction for unlawful possession of a firearm.  (Dkt. 1 at 5, 7.)

7                                  DISCUSSION

8              Respondent concedes that petitioner properly exhausted his two grounds for federal habeas

9    relief by fairly presenting the claims to the Washington Supreme Court on direct appeal.[2]  (Dkt.

10   10 at 7.)  Respondent argues, however, that petitioner is not entitled to relief with respect to either

11   of those claims.  (*See id*. at 11-26.)

12                               Standard of Review

13             Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

14   petition may be granted with respect to any claim adjudicated on the merits in state court only if

15   (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

16   established federal law, as determined by the United States Supreme Court, or (2) the decision was

17   based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C.

18   § 2254(d).  In considering claims pursuant to § 2254(d), the Court is limited to the record before

19   the state court that adjudicated the claim on the merits, and the petitioner carries the burden of

20   proof.  *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

21

22             [2]  This Court questions whether petitioner did, in fact, properly exhaust his first ground for relief as it does
     not appear that petitioner fairly presented his federal due process claim to the Washington Supreme Court on direct
23   appeal.  However, because respondent has conceded exhaustion, the Court must address the merits of the claim.

REPORT AND RECOMMENDATION
PAGE - 8

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id.* at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must

REPORT AND RECOMMENDATION
PAGE - 9

1   establish that the state court's decision rested on a finding of fact that is '*objectively*

2   unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v.*

3   *Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original); *see also Lockyer*, 538 U.S. at

4   75.  "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence

5   in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012).  In addition,

6   the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the

7   presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

8                          Ground One:  Admissibility of Evidence

9          Petitioner asserts in his first ground for relief that the trial court erroneously admitted at

10  trial Christopher Patterson's post-arrest statement to police as substantive evidence and that the

11  admission of this evidence violated petitioner's rights to due process and a fair trial.  (*See* Dkt. 1

12  at 5; Dkt. 2 at 21.)  Petitioner set forth in his petition the following facts in support of his first

13  ground for relief:

14          Upon arrest, an individual (Patterson) gave a statement to police implicating
         himself and Petitioner in the burglaries for which Petitioner was ultimately
15       convicted.  Patterson later refuted the statement, and testified at trial that he
         committed the burglaries alone and was coerced by police into giving his original
16       statement.  The court admitted the original statement over the objection of defense
         counsel, finding that it constituted an exception to the hearsay rule under ER
17       801(d)(1)(iii) as a statement ["]of identification of a person made after perceiving
         the person."

18

19  (Dkt. 1 at 5.)

20          It is well established that "federal habeas corpus relief does not lie for errors of state law."

21  *Lewis v. Jeffers*, 497 U.S. 764 (1990).  Questions related to the admissibility of evidence are

22  typically matters of state law for which federal habeas relief is unavailable.  *Estelle v. McGuire*,

23  502 U.S. 62, 67-68 (1991).  Only if the admission of evidence rendered the trial fundamentally

REPORT AND RECOMMENDATION
PAGE - 10

1  unfair in violation of due process is federal habeas relief available.  *Johnson v. Sublett*, 63 F.3d

2  926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-69).

3          When considering whether evidence alleged to have been erroneously admitted at trial

4  rendered the proceeding fundamentally unfair, the federal habeas court must determine whether

5  the error had a substantial and injurious effect or influence in determining the verdict.  *Brecht v.*

6  *Abrahamson*, 507 U.S. 619, 638 (1993).  In *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.

7  2009), the Ninth Circuit observed that "even clearly erroneous admissions of evidence that render

8  a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden

9  by 'clearly established Federal law,' as laid out by the Supreme Court."  The Ninth Circuit went

10  on to explain that

11          The Supreme Court has made very few rulings regarding the admission of evidence
         as a violation of due process.  Although the Court has been clear that a writ should
12          be issued when constitutional errors have rendered the trial fundamentally unfair, .
         . . it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial
13          evidence constitutes a due process violation sufficient to warrant issuance of the
         writ.

14

15  *Id*. (citation omitted.)

16          The record reflects that Christopher Patterson was arrested two days after the residential

17  burglaries with which Patterson and petitioner were eventually charged.  (Dkt. 11, Ex. 9 at 21-23.)

18  Following his arrest, Patterson made statements to the police admitting his involvement in the

19  burglaries and identifying petitioner, Cody Wade, and Filmon Berhe as having also been involved

20  in the burglaries.  (*Id*., Ex. 9 at 25-28.)  Patterson also identified petitioner as the person who

21  handled the firearms that were stolen during the burglaries.  (*Id*., Ex. 9 at 28.) In addition to his

22  oral statement to police, Patterson provided a signed written statement.  (*Id*., Ex. 9 at 57-60.)

23          Patterson testified at petitioner's trial under a grant of immunity, though he initially refused

REPORT AND RECOMMENDATION
PAGE - 11

to testify and had to be compelled to do so. (*Id.*, Ex. 8 at 4-7, 17-18.) Prior to Patterson taking the stand, petitioner's counsel objected to the State's attempt to call Patterson as a witness, arguing that the prosecution knew Patterson would not testify consistent with his prior statement and was calling him only to elicit from him a denial of the statement he gave to police following his arrest so that it could impeach him with the statement. (*Id.*, Ex. 8 at 7-9.) The defense argued that under the rule announced by the Washington Supreme Court in *State v. Lavaris*, 106 Wn.2d 340 (1986), the State was not permitted to call a witness for the primary purpose of impeaching the witness with otherwise inadmissible evidence. (*Id.*, Ex. 8 at 7-9.) The State, in turn, argued that it had other reasons to call Patterson, in particular, for the purpose of identification and to establish that the burglaries occurred. (*Id.*, Ex. 8 at 9-11.) The trial court concluded that *Lavaris* did not bar Patterson's testimony. (*Id.*, Ex. 8 at 13.)

The trial court then went on to grapple with the question of whether the identification testimony the State sought to admit was mere impeachment or whether it was substantive evidence. (*Id.*, Ex. 8 at 13-16.) The State argued that Patterson's statements of identification were admissible as substantive evidence under ER 801(d)(1)(iii) and relied on the Washington Court of Appeals' decision in *State v. Grover*, 55 Wn. App. 923 (1989) to support that argument. (*See id.*, Ex. 8 at 14-16.) The trial court deferred ruling on issues concerning the use of the identification testimony and permitted Patterson to testify. (*Id.*, Ex. 8 at 16.)

Following additional briefing, the trial court admitted the identification testimony as substantive evidence, explaining that it believed it was bound by the decision in *Grover* to do so. (*Id.*, Ex. 9 at 4-12.) In making its ruling, the trial court noted that though it deemed the evidence admissible under *Grover*, that did not render the evidence conclusive: "We all know that Mr. Patterson was a codefendant. We also know that at the time of the event, he may have had his own

REPORT AND RECOMMENDATION
PAGE - 12

1    motivations for implicating somebody else, whether truthful or not truthful.    So it's not

2    conclusive."  (*Id.*, Ex. 9 at 11.)  The trial court went on to explain that "[i]t's just admissible

3    evidence that the Court can consider, and whether the Court finds it persuasive or not is a different

4    question."  (*Id.*, Ex. 9 at 12.)

5        A police detective subsequently testified about Patterson's statements and, in response to

6    defense counsel noting a continuing objection to the admission of Patterson's statements, the trial

7    court clarified that though it had ruled the statements with respect to identification were admissible

8    as substantive evidence, "all of the other statements that he makes are for impeachment only and

9    not for substantive evidence."  (*Id.*, Ex. 9 at 26.)  The trial court went on to advise the parties

10   "[b]elieve me, I'll be very cognizant of how this evidence can and cannot be used for adjudicative

11   purposes."  (*Id.*, Ex 9 at 27.)

12       On direct appeal, petitioner argued that the trial court erred in admitting Patterson's

13   statement implicating petitioner in the crimes as substantive evidence because ER 801(d)(1)(iii)

14   does not extend to circumstances involving the admission of a co-defendant's incriminating post-

15   arrest statements.  (*Id.*, Ex. 17 at 14-16.)  Petitioner further argued in his opening brief on appeal

16   that the admission of Patterson's statement denied him a fundamentally fair trial.  (*Id.*, Ex. 17 at

17   19-20.)

18       The Washington Court of Appeals rejected petitioner's claim regarding the alleged

19   improper admission of Patterson's post-arrest statement, affirming the trial court's application of

20   ER 801(d)(1)(iii) and *Grover*.  The Court of Appeals explained its conclusion as follows:

21          Wade argues that the hearsay exception under ER 801(d)(1)(iii) does not
22          apply if the declarant is a coparticipant in the crime, because unlike a civilian
            witness, a potential codefendant has "enormous incentive" to falsely implicate
            others.  Nothing in <u>Grover</u> suggests such a limitation.  In fact, the dynamics of this
23          case are strikingly similar to those in <u>Grover</u>.  The facts of <u>Grover</u> defeat Wade's

REPORT AND RECOMMENDATION
PAGE - 13

argument.  The circumstances clearly suggested Gardner's possible involvement in the crime when police initially questioned her.  See Grover, 55 Wn. App. at 254.  Gardner recanted her earlier identification.  Id. at 255.  Although she denied being threatened, it is reasonable to infer that she did so out of fear of retaliation.  Id.  Here, Patterson recanted his earlier statement to police, admitting he was involved and implicating the others.  His testimony that he was labeled a "snitch" which put his life in "jeopardy" likewise supports the inference that he changed his story at trial out of fear.

For a declarant's statement to be admissible under ER 801(d)(1)(iii), the declarant must be available for cross-examination.  Wade offers reasons to credit Patterson's trial testimony over his initial statement but there are equally compelling reasons to reach the opposite conclusion.  Nothing in ER 801(d)(iii) [sic] or in the cases interpreting the rule suggests that a prior statement of identification is not admissible because it creates a conflict that the trier of fact must resolve.  Wade had the opportunity to fully explore Patterson's motivations and the circumstances of his initial statement.  In sum, the court did not err in admitting Patterson's statement as substantive evidence under 801(d)(1)(iii).

Even if the statement that Wade was with Patterson on October 9, 2012 falls within the scope of ER 801(d)(1)(iii), Wade contends the rule does not apply to Patterson's additional statements that described the nature of his involvement in the crimes.  But, in fact, the trial court decided the admissibility of only Patterson's statement that he was with Wade and the others under ER 801(d)(1)(iii).  The record indicates that the court considered Patterson's additional statements only for purposes of impeachment.

(Id.)

Despite petitioner's assertion that the admission of Patterson's statements of identification as substantive evidence violated his due process rights, the claim, in fact, implicates only state law evidentiary concerns.  Even assuming the claim could be construed as one implicating petitioner's federal constitutional rights, petitioner cites to no clearly established federal law which would have required the trial court to exclude the evidence at issue here.

Petitioner, in support of his due process claim, relies primarily upon a series of United States Supreme Court cases in which the holdings pertain to issues arising under the Confrontation Clause.  *See Douglas v. Alabama*, 380 U.S 415 (1965); *Bruton v. United States*, 391 U.S. 123

REPORT AND RECOMMENDATION
PAGE - 14

(1968); *Dutton v. Evans*, 400 U.S. 74 (1970); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Ohio v. Roberts*, 448 U.S. 56 (1980); *Lee v. Illinois*, 476 U.S. 530 (1986); *Lilly v. Virginia*, 527 U.S. 116 (1999).  Petitioner has made clear that he is not presenting a Confrontation Clause claim in these proceedings but, rather, is alleging a violation of his rights to due process and a fair trial. (Dkt. 2 at 34.)  The Supreme Court's Confrontation Clause jurisprudence does nothing to advance petitioner's due process argument.

The remaining Supreme Court cases cited by petitioner – *Washington v. Texas*, 388 U.S. 14 (1967), *Patterson v. New York*, 432 U.S. 197 (1977), *Pulley v. Harris*, 464 U.S. 37 (1984), and *Payne v. Tennessee*, 501 U.S. 808 (1991) – likewise provide no basis for relief as none of the holdings in those cases address the constitutionality of evidentiary rules such as the one at issue here.  Absent clearly established law relating to petitioner's due process challenge to the admission of Patterson's statements, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.  *See Brewer*, 378 F.3d at 955.  Petitioner's federal habeas petition should therefore be denied with respect to his first ground for relief.

<u>Ground Two:  Sufficiency of the Evidence</u>

Petitioner asserts in his second ground for relief that the State presented insufficient evidence to prove beyond a reasonable doubt that he was in unlawful possession of a firearm. (Dkt. 1 at 7; Dkt. 2 at 41-45.)  Petitioner argues that there was no evidence he was in actual or constructive possession of a firearm as required under Washington law.   (Dkt. 2 at 42-43.) Petitioner maintains that the only evidence presented that he was ever in possession of a firearm was Patterson's improper and inherently unreliable hearsay statement, and that this evidence is insufficient because the trial court did not rely on it in finding him guilty of the unlawful possession of a firearm charge.  (*See* Dkt. 1 at 7; Dkt. 2 at 43-44.)

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt each element of the charged offense. *Carella v. California*, 491 U.S. 263, 265 (1989) (citing *In re: Winship*, 397 U.S. 358, 364 (1970)). Due process claims challenging the sufficiency of the evidence are evaluated under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court explained in *Jackson* that the relevant question in evaluating a claim of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

It is the responsibility of the trier of fact, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). The Supreme Court has made clear that a reviewing court must be mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296-97 (1992). In *West*, the Court emphasized the deference owed to the trier of fact:

> We said [in *Jackson*] that "*all of the evidence* is to be considered in the light most favorable to the prosecution" . . . that the prosecution need not affirmatively "rule out every hypothesis except that of guilt" . . . and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*West*, 505 U.S. at 296-97 (quoting *Jackson*, 443 U.S. at 326) (citations omitted, emphasis in original).

The Supreme Court has also made clear that sufficiency of the evidence claims are subject

REPORT AND RECOMMENDATION
PAGE - 16

to a second layer of judicial deference on federal habeas review.  Specifically, the Supreme Court has held that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

Petitioner argued on direct appeal that there was insufficient evidence presented at trial to convict him of any of the charged offenses other than trafficking in stolen property.  (Dkt. 11, Ex. 17 at 20-22.)   The Washington Court of Appeals, in analyzing petitioner's sufficiency of the evidence claim, first set out the governing legal standard:

> To satisfy due process, the State must prove every element of a charged crime beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  When reviewing a challenge to the sufficiency of the evidence, this court considers the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt.  State v. Williams, 137 Wn. App. 736, 743, 154 P.3d 322 (2007).  The court draws all reasonable inferences from the evidence in the State's favor and interprets the evidence "most strongly against the defendant."  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  The reviewing court considers both circumstantial and direct evidence as equally reliable and defers to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence.  State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

(*Id*., Ex. 20 at 13-14.)

The Court of Appeals then went on to address each offense and/or set of offenses separately, and it rejected petitioner's sufficiency of the evidence claim in its entirety.  (*Id*., Ex. 20 at 14-20.)  With respect to petitioner's challenge to the sufficiency of the evidence to support the charge of unlawful possession of a firearm, the Court of Appeals concluded as follows:

> Under RCW 9.41.040(1) a person commits unlawful possession of a firearm "if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . of any serious offense."  Wade

REPORT AND RECOMMENDATION
PAGE - 17

does not dispute that he was previously convicted of a serious offense. A person actually possesses something that is in his or her physical custody, and constructively possesses something that is not in his or her physical custody, but is still within his or her "dominion and control." State v. Callahan, 77 Wn.2d 27, 29, 459 P.2d 400 (1969). For either actual or constructive possession, the prosecution must prove more than a passing control. State v. Staley, 123 Wn.2d 794, 801, 872 P.2d 502 (1994). While the ability to immediately take actual possession of an item can establish dominion and control, mere proximity to the item by itself cannot. Cf. State v. Jones, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002); State v. Spruell, 57 Wn. App. 383, 388, 788 P.2d 21 (1990). Factors supporting dominion and control include ownership of the item and, in some circumstances, ownership of the premises. State v. Tadeo-Mares, 86 Wn. App. 813, 816, 939 P.2d 220 (1997). Whether one has actual control over the item at issue depends on the totality of the circumstances. Staley, 123 Wn.2d at 802.

Wade claims there was no evidence that he exercised dominion and control over any firearm, and at most, the evidence indicated only proximity to the stolen guns. Wade relies on the Washington Supreme Court's recent decision in State v. Davis, 182 Wn.2d 222, 340 P.3d 820 (2014). In Davis, both defendants were convicted of rendering criminal assistance and firearm possession charges based on their actions following Maurice Clemmons's notorious shooting of four Lakewood, Washington police officers. Id. at 224. Clemmons sustained a gunshot injury and stole a firearm from one of the officers he shot and killed. Id. at 224-25. After the shooting, Eddie Lee Davis drove Clemmons to Letrecia Nelson's home. Id. at 225. After Nelson let the two men inside, Clemmons told Nelson about the shooting and the stolen firearm and requested clean clothes and assistance in treating his wound. Id. While another person helped Clemmons with the wound, Nelson put clothes and the stolen firearm in a shopping bag. Id. at 227-28. Clemmons stayed at Nelson's home for approximately 15 minutes. Id. at 228. Just before leaving, Clemmons asked Davis, "'Where's the gun?'" Id. Davis responded that the gun was in a bag and handed the bag to Clemmons. Id.

A majority of the court determined that neither Nelson nor Davis exercised dominion and control over the firearm, because neither "asserted any interest" in the gun, but merely "briefly handled the item for Clemmons, the true possessor of the gun."[footnote omitted] Id. at 235 (Stephens, J. dissenting). Critical to the court's conclusion were the circumstances of Clemmons's arrival and his tendency to control his family members. Id. While Clemmons was briefly distracted by other pressing issues while at Nelson's home and apparently did not know the gun had been placed in a bag, there was nothing to suggest he intended to transfer possession or control. Id. at 237. Nelson's and Davis's actions amounted to "mere proximity to and momentary handling" of the contraband. Id. at 235.

The evidence here does not suggest that Wade momentarily handled the guns on behalf of a true possessor or that he was merely proximate to stolen

REPORT AND RECOMMENDATION
PAGE - 18

firearms.  Unlike Nelson and Davis, Wade stole the guns as a principal or an accomplice.  Wade was the driver and exercised control over the Camry, used to transport the guns.  Wade was the person who opened the trunk and manipulated the property within it.  Wade's attempt to conceal items as he stood behind the trunk suggests that the items he was handling would be readily recognized as contraband.  Wade appeared to be in charge of the initial distribution of the stolen firearms.  It is reasonable to infer from this evidence that Wade exercised dominion and control over the guns.  Wade continued to exercise control over the firearms after he was arrested, by directing Cody's actions with respect to them.  Thus, here also, even absent Patterson's statement that Wade was the person who handled the guns, the evidence is sufficient to support the trial court's determination that he exercised dominion and control and therefore committed the crime of unlawful possession of a firearm.[3]

(*Id.*, Ex. 20 at 17-19.)

This Court has reviewed the trial transcript and the remainder of the state court record submitted by the parties.  The record shows that the Washington Court of Appeals applied the correct standard in evaluating petitioner's sufficiency of the evidence claim.  According deference to the trial court's findings and conclusions, and to the Court of Appeals' resolution of the claim in relation to the evidence presented at trial, this Court must conclude that the state court reasonably rejected petitioner's challenge to the sufficiency of the evidence as there was, indeed, sufficient evidence in the record to support petitioner's conviction for unlawful possession of a firearm.  Petitioner's federal habeas petition should therefore be denied with respect to his second ground for relief as well.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

---

[3]  [Court of Appeals' footnote 5] At oral argument, Wade suggested that his conviction for unlawful possession of a firearm should be reversed because the trial court failed to make a specific finding that Wade physically possessed any gun at a specific point in time.  However, when the findings are unclear or fail to address an important point, the appropriate remedy is remand and Wade does not request this remedy.  See State v. Head, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998) (no findings prepared); see also State v. Alvarez, 128 Wn.2d 1, 19, 904 P.2d 754 (1995) (no bench trial findings on ultimate facts).

REPORT AND RECOMMENDATION
PAGE - 19

dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to either of the claims asserted in his petition.

<u>CONCLUSION</u>

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas corpus be denied and that this action be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to both claims asserted in this federal habeas action. A proposed order accompanies this Report and Recommendation.

<u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **<u>September 25, 2020</u>**.

/ / /

/ / /

REPORT AND RECOMMENDATION
PAGE - 20

DATED this <u>8th</u> day of September, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 21